# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ERIC FELDMAN,

        Plaintiff,

        v.

CENTRAL INTELLIGENCE AGENCY,

        Defendant.

Civil Action No. 09-02080 (BAH)

## MEMORANDUM OPINION

Plaintiff Eric Feldman, the former Inspector General of the National Reconnaissance Office ("NRO"), brought this action against his employer, the Central Intelligence Agency, for alleged violations of the Privacy Act of 1974, the law that governs how federal agencies must treat records containing personal information. Feldman, a CIA employee, was detailed to the NRO as Inspector General. The NRO is a U.S. government intelligence agency that operates spy satellites. During Feldman's detail as NRO Inspector General, the CIA's Inspector General began investigating Feldman for purported improprieties in his claims for reimbursement of travel expenses. As a result of the investigation, the CIA ultimately reprimanded Feldman and reassigned him to a different position. Feldman alleges that the investigation was motivated by personal grievances against him, and that the CIA violated the Privacy Act by leaking details of the pending investigation to unauthorized NRO and CIA employees and to a Congressional staffer. Feldman also alleges the CIA maintained inaccurate records about him. The CIA has moved to dismiss the Complaint or, in the alternative, for summary judgment. For the reasons explained below, the CIA's motion is granted in part and denied in part.[1]

---

[1] The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 because this case arises under a federal law – the Privacy Act – and "the district courts . . . have original jurisdiction of all civil actions arising under the

## I. BACKGROUND

The Complaint alleges the following facts which the Court assumes to be true for the purposes of resolving a motion to dismiss.

Plaintiff Eric Feldman joined the Office of the Inspector General of the CIA in 1998. Compl. ¶ 5.  In 2003, the CIA detailed Feldman to the NRO to serve as its Inspector General ("NRO IG").  *Id.*  Although Feldman was detailed to the NRO, the CIA continued to serve as his official employer.  *Id.* ¶ 4.

### *Feldman's Relocation*

In March 2006, the NRO director determined that Feldman would be relocated from the Washington, D.C. area to Los Angeles in June 2006.[2]  *Id.* ¶ 6.  Feldman subsequently sought and obtained permission to accelerate his move date – or Permanent Change of Station ("PCS") in agency parlance – to May 21, 2006 based on the availability date of the house he intended to rent in California.  *Id.* ¶ 7.

Prior to May 21, 2006, NRO approved travel expenses for Feldman's family to cover their temporary living expenses related to the relocation.  *Id.* ¶ 11.  These travel expenses are known as Temporary Quarters Subsistence Expenses ("TQSE") and are calculated according to methods specified in 41 C.F.R. § 302-6.200-6.304.  *Id.* ¶ 10.  In addition to TQSE payments for his family, Feldman also received approval for TQSE payments to cover the cost of his own temporary quarters in California.  *Id.* ¶ 12.

From May 30, 2006 to July 25, 2006, Feldman was on a combination of authorized vacation time, known as "annual leave," and authorized work time away from his primary work

---

Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  Venue is proper in this District under the Privacy Act itself, which expressly provides that civil Privacy Act actions may be brought in federal district court in the District of Columbia.  5 U.S.C. § 552a(g)(5).

[2] The location of Feldman's relocation was redacted from the Complaint at the request of the CIA, but the CIA subsequently decided that the location could be made public.  *See, e.g.*, Compl. ¶¶ 11-15; Def.'s Mem. at 19 n.8.

location, known as "Temporary Duty Yonder," or "TDY." *Id.* ¶ 13. TDYs – i.e., work travel expenses – represent a different category of reimbursable expenses from TQSE relocation expenses. While Feldman's personal relocation occurred on May 21, 2006, his family did not complete their move to California until July 27, 2006. *See id.* ¶ 14. Thus, Feldman's TDY expenses from late May through July 2006 apparently arose from his need to travel back to the Washington, D.C. area during that period, despite his recent permanent change of station. According to the plaintiff, all expenditures related to Feldman's move and his TDY were authorized in advance and ultimately approved by senior NRO officials funded with NRO, not CIA, resources. *Id.* ¶ 15.

### The CIA Inspector General's Investigation

Around August 2006, the CIA Office of the Inspector General ("CIA OIG") opened an investigation into Feldman's conduct. *Id.* ¶ 16. The investigation was triggered by an accusation from a "senior NRO source" whom the plaintiff believes to be a former Deputy NRO IG who was fired from the NRO for cause. *Id.* The plaintiff also believes that the CIA OIG's investigation relied upon anonymous allegations arising from a January 2007 audit survey. *Id.* The apparent focus of the investigation was whether Feldman had sought double recompense for certain expenses by submitting them for reimbursement under both the TDY and TQSE reimbursement frameworks. *See id.* ¶ 19.

On May 17, 2007, the CIA OIG referred its investigation, which was not yet complete, to the Department of Justice's Public Integrity Section, which prosecutes cases of public corruption. *Id.* ¶ 17.

In the fall of 2007, a senior staff member of the House Permanent Select Committee on Intelligence called Feldman and advised him that he had heard Feldman was under criminal

investigation by the CIA OIG. *Id.* ¶ 42; Declaration of Eric R. Feldman, dated December 2, 2010 ("Feldman Decl.") ¶ 6.[3]  This senior staffer told Feldman that "he received this information from Donald Stone, a professional [Senate Select Committee on Intelligence] staff member, who was a former employee of the CIA OIG and had unsuccessfully competed against Feldman in 2003 for the NRO IG position."  Compl. ¶ 42.

Around December 2007, Feldman's deputy IG learned from an NRO contractor that Feldman was under investigation by the CIA OIG.  *Id.* ¶ 43.

On January 28, 2008, the CIA OIG formally notified Feldman that it was investigating discrepancies in his travel expenses.  *Id.* ¶ 18.  Three days later, on January 31, two CIA OIG agents interviewed Feldman.  *Id.* ¶ 19.  The agents told Feldman they were undertaking a criminal investigation into his relocation expenses and they told him that he had been accused of intentionally claiming lodging expenses twice, both under TDY and TQSE, when he stayed at a Residence Inn hotel in Chantilly, Virginia.  *Id.*  The plaintiff believes that, despite the agents' claim, their investigation was not criminal, but rather administrative, since the CIA OIG is not a law enforcement agency.  *Id.*

The plaintiff alleges that around January or February 2008, the CIA IG, John L. Helgerson, personally briefed the NRO director and told him that Feldman should be fired and that an ethics conference Feldman was coordinating should be cancelled for fear of embarrassment.  *Id.* ¶ 17.

Generally, the plaintiff alleges that the CIA OIG investigation was motivated by personal grievances against him.  *See id.*, Preamble ("Senior officials within the CIA, to include the former Inspector General John L. Helgerson . . . and others within his office, intentionally

---

[3] In his declaration, the plaintiff states that the date of the conversation with the senior staffer was in in the fall of 2006, rather than the fall of 2007.  Feldman Decl. ¶ 6.

conspired to undermine confidence in Feldman based on personal bias, factual distortions and manipulated analysis . . . [and] sought to repeatedly publicly defame Feldman and spread false and/or privacy protected information . . .").

By February 2008, Feldman, with the assistance of counsel, began requesting documents and policies related to the investigation from the CIA OIG, and identified purported conflicts of interest regarding the investigation. *Id.* ¶¶ 22-35.

From April to December 2008, several NRO and CIA employees with no official connection to the CIA OIG investigation learned that Feldman was under investigation. *Id.* ¶¶ 44-50. Several of these employees allegedly learned of the investigation from an NRO employee named Hannah Marter, who the plaintiff claims "alluded to an unnamed source or sources in the CIA's OIG." *Id.* ¶¶ 44-49.

On May 7, 2008, the Department of Justice ("DOJ") declined to pursue prosecution of Feldman. *Id.* ¶ 17.

The CIA OIG's investigation of Feldman's conduct resulted in a report of investigation entitled "Travel-Related Fraud and Waste: Eric R. Feldman" (the "ROI"). *Id.* ¶ 34. The conclusions of the ROI were that (1) the CIA director should determine the appropriate administrative action in Feldman's case; (2) the CIA director should be aware of certain previous allegations of wrongdoing involving Feldman; and (3) Feldman should be directed to reimburse $5,515.19 for improper billing of hotel accommodations and miscellaneous incidental expenses. *Id.*

On June 10, 2008, Feldman and his counsel reviewed a draft version of the ROI at a CIA facility and, on June 18, 2008, the plaintiff "submitted a written response to the draft ROI" challenging its findings. *Id*. ¶¶ 24-25.

Subsequently, the CIA OIG produced a final version of the ROI that incorporated responses to Feldman's comments on the draft version. *Id.* ¶ 34. Feldman contends that the final ROI only responded to his comments in a very superficial way. *Id.*

On September 19, 2008, CIA IG Helgerson disclosed the final ROI to the Senate Select Committee on Intelligence (the "SSCI"). *Id.* ¶ 36. Feldman believes that, through this disclosure to the SSCI, the CIA IG "intentionally politicized" the investigation based on a "personal feud." *Id.*

Feldman and his counsel had the opportunity to review the final ROI around the same time that the CIA IG sent it to the SSCI, on September 18 and 19, 2008. *Id.* ¶ 34. Feldman then submitted a detailed, written response to the final ROI on September 25, 2008. *Id.* ¶ 35.

In an October 8, 2008 letter to the NRO director, Senator John D. Rockefeller, the Chairman of the SSCI, called for Feldman to be removed from his position. *Id.* ¶ 36. Feldman's counsel subsequently sent Senator Rockefeller a copy of the written response to the ROI, and the plaintiff alleges that the SSCI and Senator Rockefeller then "completely removed themselves from the dispute." *Id.* ¶ 37.

On December 3, 2008, the CIA director issued a decision regarding Feldman's conduct. *Id.* ¶ 38. While the director did not accept all of the ROI's conclusions, he did find that Feldman had a pattern of seeking reimbursements that were "in excess of what was reasonably necessary" to conduct official travel. *Id.* The CIA director wrote: "I have concluded that the manner in which you arranged and conducted your official travel, and the reimbursements you sought as a result of your travel, show that you were more interested in maximizing your personal financial gain than prudently using official travel funds." *Id.* Accordingly, he issued a letter of reprimand, suspended Feldman for five days, and removed him from his position as NRO IG. *Id.* The CIA

and NRO reassigned Feldman to serve as Senior Adviser for Procurement Integrity for the NRO director. *Id.* ¶ 39.

### *The Plaintiff's Causes of Action*

Feldman's claims for violation of the Privacy Act fall into two basic categories. First, Feldman alleges in Count I that the CIA OIG committed various improper disclosures of Privacy Act-protected personal information by leaking details of the OIG investigation to unauthorized third parties. *Id.* ¶¶ 55-63. Second, Feldman alleges in Counts II, III, and IV that the CIA failed to maintain and disclose accurate records about him. *Id.* ¶¶ 64-83. These inaccurate recordkeeping claims are premised on Feldman's rejection of the findings of the ROI, which is itself a record. *See id.* Feldman seeks monetary damages, a declaration that CIA officials violated the Privacy Act, referral of those officials for prosecution for their Privacy Act violations, and reimbursement of costs. *Id.* ¶ 83.

On August 12, 2010, the CIA filed a motion to dismiss the Complaint pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure, or, in the alternative, a motion for summary judgment pursuant to Rule 56, or for a more definite statement as to the information upon which the plaintiff relies for his claims pursuant to Rule 12(e).[4]

The defendant's motion is now before the Court.

## II.    LEGAL STANDARDS AND STATUTORY FRAMEWORK

### A.  Motion to Dismiss Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face" and to "nudge[ ] [his or her] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); Fed. R. Civ. P. 12(b)(6). "[A] complaint [does not] suffice

---

[4] This case was re-assigned, on January 20, 2011, to the presiding judge.

if it tenders naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (internal quotation marks omitted) (citing *Twombly*, 550 U.S. at 557). Instead, the complaint must plead facts that are more than "merely consistent with" a defendant's liability; "the plaintiff [must plead] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### B.  Motion for Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56, the Court will grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" based upon the pleadings, depositions, and affidavits and other factual materials in the record.  Fed. R. Civ. P. 56(a), (c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  The Court "need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).  The Court must view all inferences in a light most favorable to the non-moving party.  *Tao*, 27 F.3d at 638 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 255 (1986)).  The burden is on the moving party to demonstrate that there is an "absence of a genuine issue of material fact" in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Summary judgment is ordinarily appropriate only after the plaintiff has been given an adequate opportunity to conduct discovery.  *McWay v. LaHood*, 269 F.R.D. 35, 39 (D.D.C. 2010) (citing *Americable Int'l, Inc. v. Dep't of Navy,* 129 F.3d 1271, 1274 (D.C. Cir. 1997)).

### C.  The Privacy Act

The Privacy Act, 5 U.S.C. § 552a, "safeguards the public from unwarranted collection, maintenance, use and dissemination of personal information contained in agency records . . . by allowing an individual to participate in ensuring that his records are accurate and properly used."

*Cloonan v. Holder*, No. 08-cv-700, 2011 WL 782028, at *6 (D.D.C. Mar. 8, 2011) (quoting

*Henke v. Dep't of Commerce*, 83 F.3d 1453, 1456 (D.C. Cir. 1996)). "To accomplish this goal,

the Act 'gives agencies detailed instructions for managing their records and provides for various

sorts of civil relief to individuals aggrieved by failures on the Government's part to comply with

the requirements.'" *Id.* (quoting *Doe v. Chao*, 540 U.S. 614, 618 (2004)). "For example, the Act

limits the circumstances under which an agency may disclose records of individuals, mandates

that agencies closely account for all disclosures, and requires agencies to make reasonable efforts

to ensure the accuracy and completeness of records." *Id.* (internal citations omitted).

Section (g)(1) of the Privacy Act establishes the circumstances in which a plaintiff may

seek civil remedies. 5 U.S.C. § 552a(g)(1). Section (g)(1) recognizes "a civil action for agency

misconduct fitting within any of four categories . . . and then makes separate provision for the

redress of each." *Chao*, 540 U.S. at 618. "The first two categories cover deficient management

of records: subsection (g)(1)(A) provides for the correction of any inaccurate or otherwise

improper material in a record, and subsection (g)(1)(B) provides a right of access against any

agency refusing to allow an individual to inspect a record kept on him." *Id.* "The two remaining

categories deal with derelictions having consequences beyond the statutory violations *per se*."

*Id.* at 619. "Subsection (g)(1)(C) describes an agency's failure to maintain an adequate record on

an individual, when the result is a determination 'adverse' to that person." *Id.* "Subsection

(g)(1)(D) speaks of a violation when someone suffers an 'adverse effect' from any other failure

to hew to the terms of the Act." *Id.* Suits under Subsections (g)(1)(C) and (D) require a showing

that "the agency acted in a manner which was intentional or willful" and that the plaintiff

sustained "actual damages." *Id.* (citing 5 U.S.C. § 552a(g)(4)(A)).

In this case, plaintiff has pled four Privacy Act causes of action based on the CIA's handling of the OIG Report about him. The plaintiff's claim in Count I is for unlawful disclosure of records under Subsection (g)(1)(D). The remaining three claims all fall under Subsection (g)(1)(C). The second claim is for failure to maintain accurate records pursuant to Section (g)(1)(C) generally. The third claim is also for failure to maintain accurate records, but it specifically invokes Subsection (e)(5), which requires an agency to "maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination." 5 U.S.C. § 552a(e)(5). Finally, the fourth claim is for failure to take reasonable efforts to ensure records are accurate before disseminating them. This claim is brought pursuant to Subsection (g)(1)(C) and Subsection (e)(6), which provides that an agency "make reasonable efforts to assure that [] records are accurate, complete, timely, and relevant for agency purposes" prior to disseminating such records. 5 U.S.C. § 552a(e)(6).

## III. DISCUSSION

As explained more fully below, the Court finds that the plaintiff has stated a claim in Count I for unlawful disclosure under the Privacy Act and is entitled to discovery on that claim. The Court finds that the remaining claims in Counts II, III, and IV – premised on the failure to maintain accurate records – should be dismissed.

### A. The plaintiff has stated a claim for unlawful disclosure in violation of the Privacy Act.

As noted above, the first cause of action alleges that unlawful disclosures of Privacy Act-protected information occurred when information regarding the investigation of the plaintiff leaked to unauthorized third parties. Specifically, the plaintiff alleges that various NRO and CIA employees and a staffer on the Senate Select Committee on Intelligence learned of the

investigation despite having no official connection to it, and he alleges that these facts suggest that unauthorized disclosures occurred.  The defendant argues that the plaintiff's disclosure claim should be dismissed because the plaintiff's theory of the case ignores two "logical" conclusions: (1) the CIA did not violate the Privacy Act in keeping the Senate Select Committee on Intelligence and its staff informed about the investigation because such disclosures are expressly permitted under the Act; and (2) rumors about the investigation could easily have spread to NRO employees from other employees who were interviewed during the OIG investigation, rather than from any unauthorized disclosure of protected records.  Def.'s Mem. at 17-18.   As explained below, the Court agrees with the defendant that the plaintiff has not stated a viable claim regarding the alleged unlawful disclosure to the SSCI staffer, but the plaintiff has alleged a viable claim based on the purported leaks to the NRO and CIA employees.

To prevail on a Privacy Act claim for unlawful disclosure, "a plaintiff must show that (1) the disclosed information is a 'record' contained within a 'system of records'; (2) the agency improperly disclosed the information; (3) the disclosure was willful or intentional; and (4) the disclosure adversely affected the plaintiff."  *Doe v. U.S. Dept. of Treasury*, 706 F. Supp. 2d 1, 6 (D.D.C. 2009).  "Not every nonconsensual disclosure of information contained in Privacy Act-protected records constitutes a violation of the Privacy Act," however.  *Id*.  Under the so-called "retrieval rule," "the Privacy Act only covers disclosures of information [that] was either directly or indirectly retrieved from a system of records. [Thus], [t]he disclosure of information derived solely from independent sources is not prohibited by the statute even though identical information may be contained in [a] system of records."  *Id*. (alteration in original) (quotation omitted).  In addition, an unlawful disclosure claim also requires a showing of "actual damages"

as a result of some harm resulting from the disclosure.  *See Mulhern v. Gates*, 525 F. Supp. 2d 174, 181 (D.D.C. 2007) (citing *Chao*, 540 U.S. at 620-21).

> **1. The alleged disclosures to Senate Select Intelligence Committee staff are insufficient to state a claim for relief.**

The plaintiff has alleged "[i]n or around Fall 2007, John Stopher, a senior staff member of the House Permanent Select Committee on Intelligence, called Feldman and advised him that he had heard Feldman was under criminal investigation by the CIA OIG."  Compl. ¶ 42.  Stopher told Feldman that "he received this information from Donald Stone, a professional SSCI staff member, who was a former employee of CIA OIG and had unsuccessfully competed against Feldman in 2003 for the NRO IG position."[5]  *Id.*  These allegations are insufficient to state a plausible claim that the CIA violated the Privacy Act because the CIA is legally authorized and, indeed, required to keep Congressional oversight committees informed of significant investigations and activities, and disclosures in that context do not violate the Privacy Act.

The Privacy Act permits the disclosure of records for a "routine use."  5 U.S.C. § 552a(b)(3).  A routine use means "the use of such record for a purpose which is compatible with the purpose for which it was collected." *Id.* § 552a(a)(7).  The CIA's regulations establish that one routine use of CIA records is compliance with statutory requirements for reporting to Congress.  *See* "Privacy Act of 1974; Systems of Records and Routine Uses," 70 Fed. Reg. 29832, 29858 (May 24, 2005) (Routine use j. for Inspector General Investigation and Interview Records) (stating that "[r]ecords in the [CIA] system may be disclosed to the Senate Select Committee on Intelligence and the House Permanent Select Committee on Intelligence, or other

---

[5] The plaintiff does not challenge the disclosure of the completed ROI to Sen. Rockefeller, the Chairman of the SSCI, on September 19, 2008 as an unauthorized disclosure.  *See* Pl.'s Mem. at 16 n.6.  The plaintiff also concedes that it is "possible" that the disclosure to Stone occurred outside the statute of limitations period, although the plaintiff suggests that tolling may apply if that were the case.  *See* Pl.'s Mem. at 27 n.14.  The Court need not reach the statute of limitations issue because the alleged disclosure to Stone fails to state a Privacy Act claim for the reasons described below.

congressional committees, or the staffs thereof, in connection with their oversight and legislative functions."). Under a federal statute governing the CIA OIG, the OIG is to "ensure that the Senate Select Committee on Intelligence and the House Permanent Select Committee on Intelligence . . . are kept . . . informed of significant problems and deficiencies as well as the necessity for and the progress of corrective actions." 50 U.S.C. § 403q(a)(4). Since the CIA OIG has a statutory obligation to inform the SSCI of "significant problems and deficiencies," and fulfilling that obligation is considered a routine use of Privacy Act-protected records, the mere allegation that a staffer on that committee was aware of the investigation against Feldman is insufficient to support a plausible inference that the CIA violated the Privacy Act by unlawfully disclosing protected records.

The plaintiff concedes that there is a routine use exception for the CIA to provide information to its Congressional oversight committees, but suggests that "unofficial" disclosures may not be covered by the exception. Pl.'s Mem. at 16. While the Court does not discount the possibility of situations in which a disclosure to a committee staffer would be improper because the disclosure occurred beyond the scope of the staffer's employment, the plaintiff has not alleged specific facts that suggest that Stone learned of the Feldman investigation through inappropriate channels.[6] As such, the plaintiff's allegation involving Stone presents a claim for violation of the Privacy Act that is potentially conceivable, but which has not inched "across the

---

[6] The plaintiff has alleged that "[a]ccording to the ROI itself, no one outside of the CIA OIG was privy to the information in 2006-07." Pl.'s Mem. at 16 (citing Compl. ¶ 40). The Court, however, is not convinced that the ROI necessarily intended to account for the potential awareness of the Congressional intelligence committees. In addition, as the plaintiff concedes, if the Senate staffer himself subsequently shared information about Feldman with anyone, those disclosures are not covered by the Privacy Act, which does not apply to Congress. *See* Pl.'s Mem. at 17 n.7.

line from conceivable to plausible" as it must to survive a motion to dismiss. *Twombly*, 550 U.S. at 570.[7]

### 2. The alleged disclosures to NRO and CIA employees are sufficient to state a claim for relief.

The CIA also asserts that the plaintiff has failed to state a Privacy Act claim based on the plaintiff's allegations that several NRO and CIA OIG employees learned of the Feldman investigation despite having no official connection to it. According to the defendant, the plaintiff has not adequately alleged that any disclosures to these employees resulted from records that were "actually retrieved" from a Privacy Act-protected source as opposed to originating from the employees' independent knowledge. *See* Def.'s Mem. at 17-18. As noted above, "[t]he disclosure of information derived solely from independent sources is not prohibited by the statute even though identical information may be contained in [a] system of records." *Doe v. U.S. Dept. of Treasury*, 706 F. Supp. 2d at 6. The defendant contends that the plaintiff "merely alleges that [NRO and CIA employees] were informed about his investigation by NRO, CIA, or 'unnamed sources' and unknown 'non-governmental third parties,'" and that such allegations do not establish that a protected record was necessarily disclosed because the employees may have obtained information about Feldman's investigation independently. Def.'s Mem. at 17. While the Court recognizes that the defendant has advanced a possible alternative explanation for how

---

[7] The plaintiff also suggests that disclosures to committee staffers, as opposed to members of Congress themselves, may not be covered by the routine use exception to the Privacy Act. Pl.'s Mem. at 16. This distinction, for which the plaintiff presents no clear authority, does not persuade the Court because Congressional committees necessarily rely on their staff to carry out their functions. *See Gravel v. United States*, 408 U.S. 606, 616-17 (1972) ("[C]ourts recognized what the Senate of the United States urgently presses here: it is literally impossible, in view of the complexities of the modern legislative process, with Congress almost constantly in session and matters of legislative concern constantly proliferating, for Members of Congress to perform their legislative tasks without the help of aides and assistants; that the day-to-day work of such aides is so critical to the Members' performance that they must be treated as the latter's alter egos."). Moreover, the routine use exception, as detailed in the CIA's regulations, explicitly exempts disclosure to the staffs of the Congressional intelligence committees. 70 Fed. Reg. at 29858 (stating that "[r]ecords in the [CIA] system may be disclosed to the Senate Select Committee on Intelligence and the House Permanent Select Committee on Intelligence, or other congressional committees, *or the staffs thereof . . .*") (emphasis added).

the employees found out about the Feldman investigation – namely, from other employees who were interviewed by the CIA OIG investigators – the plaintiff has nonetheless adequately stated a claim for relief.

Relying heavily on the D.C. Circuit's recent ruling in *Armstrong v. Geithner*, the CIA argues that "mere 'observations and speculation' or information from office 'rumor-mills' do not constitute Privacy Act violations." *Id.* at 19 (quoting *Geithner*, 608 F.3d 854, 858-60 (D.C. Cir. 2010)). According to the defendant's argument, the D.C. Circuit in *Armstong* rejected "a plaintiff's speculative claim that information . . . 'must have come from somewhere, could not have come from an unprotected source, and so must have come from a protected source.'" Def.'s Mem. at 20 (citing *Armstrong,* 608 F.3d at 857). The defendant's reliance on *Armstrong* is misplaced, however, because *Armstrong* was not decided at the pleading stage; in fact, *Armstrong* affirmed a judgment entered after trial. Another judge of this Court has recently summarized *Armstrong* as follows:

> *Armstrong* involved a plaintiff whose attempt to obtain employment at the USDA was sabotaged after six USDA employees received anonymous letters disclosing that the plaintiff was the subject of an on-going investigation at the Treasury Inspector General for Tax Administration's office, where he had been employed. 608 F.3d at 856. Without knowing who wrote the letters, the plaintiff sued his former office, alleging that information about the investigation in the letters was drawn from his records at the agency, and thus the disclosures were in violation of the Privacy Act. *Id.* at 857. Immediately prior to trial, it was disclosed that the letters had been written by the plaintiff's co-worker at his old office. *Id.* At trial, however, the co-worker denied "getting the information in the letters from any of the . . . supervisors involved in the investigation or from records of the investigation," and insisted that she "based the letters upon independent sources— the rumor mill, her original complaint, and her own observations, assumptions and speculations." *Id.* Based on this testimony, the district court dismissed the plaintiff's claims. *Id.*

*Cloonan*, 2011 WL 782028, at *10.

On appeal, the plaintiff in *Armstrong* argued, *inter alia*, that a Privacy Act claim could be proven on the merits by relying on a *res ipsa loquitur* inference that protected information circulating in the office 'rumor mill' "must have come from somewhere, could not have come from an unprotected source, and so must have come from a protected source." 608 F.3d at 857. The D.C. Circuit rejected that argument and affirmed the district court's judgment. The Circuit held that "Armstrong must prove someone disclosed information from a 'record,' which he has not done." *Id.* at 860. The D.C. Circuit did not hold, however, that a plaintiff must allege the full details of such a disclosure at the pleading stage, as the defendant argues here. Indeed, in the typical case, a plaintiff can hardly be expected to know the full details behind an improper disclosure prior to discovery, since those details are most likely to be under the control of the defendant. Moreover, the D.C. Circuit in *Armstrong* expressly clarified that "[t]o be sure, a person who fed the rumor mill the contents of a record that had been retrieved from a system of records may have violated the Privacy Act." *Id.* That is essentially what Feldman has alleged here. Thus, while the *res ipsa loquitur* inference invoked in *Armstrong* was inadequate to sustain a Privacy Act claim on the merits, a plaintiff's reliance on such an inference at the pleading stage may be sufficient to survive a motion to dismiss, depending on the facts alleged.

To survive a motion to dismiss, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face" and to "nudge[ ] [his or her] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Here, the plaintiff has alleged that the ROI was "maintained within one or more Privacy Act systems of records retrievable by use of Feldman's name or by some identifying number, symbol, or other identifying particular assigned to Feldman." Compl. ¶ 56. The plaintiff has further alleged that various NRO and CIA OIG employees with no official connection to the investigation learned about the investigation's

details. *Id.* ¶¶ 43-50. Feldman has identified these employees by name and identified the approximate time period in which they learned about the investigation. *Id.* Moreover, unlike the plaintiff's allegation involving disclosure to the Senate staffer, disclosures to NRO or CIA employees unaffiliated with investigation do not appear likely to be exempt from the Privacy Act. Therefore, the Court finds that the plaintiff has alleged facts that are sufficient to "state a claim to relief that is plausible on its face" and thus survive a motion to dismiss. *Twombly*, 550 U.S. at 570; *see also York v. McHugh*, 698 F. Supp. 2d 101, 107-109 (D.D.C. 2010) (denying motion to dismiss Privacy Act claim where defendant claimed plaintiff "failed to allege in her Complaint that there was an actual disclosure of the records.").

### 3. The plaintiff has adequately alleged intent at this stage of the litigation.

The defendant also argues that the Court should dismiss the plaintiff's unlawful disclosure claim because the plaintiff has not adequately alleged that the defendant intentionally and willfully violated the Privacy Act, which is a requisite element of a Privacy Act claim under subsections (g)(1)(C) and (g)(1)(D). *See* Def.'s Mem. at 26-28; 5 U.S.C. § 552a(g)(4); *Doe v. U.S. Dept. of Treasury*, 706 F. Supp. 2d at 6.

The Court disagrees. The plaintiff *has* alleged that the "CIA, its employees and officers, acted intentionally and/or willfully in violation of Feldman's privacy rights." Compl. ¶¶ 62. The CIA argues that this allegation is merely conclusory and not supported by sufficiently specific factual allegations. Def.'s Mem. at 28. Viewing the plaintiff's allegations in the light most favorable to the plaintiff, however, the Court finds that the totality of the plaintiff's allegations do adequately allege intentional or willful conduct. The thrust of the plaintiff's Complaint is that his rivals within the CIA and NRO persecuted him by ginning up a misconduct investigation against him and then leaking details of that investigation in violation of the Privacy Act. *See* Compl., Preamble ("Senior officials within the CIA, to include the former Inspector General

John L. Helgerson . . . and others within his office, intentionally conspired to undermine confidence in Feldman based on personal bias, factual distortions, and manipulated analysis . . . [and] sought to repeatedly defame Feldman and spread false and/or privacy protected information . . .").  Therefore, the Court concludes that the plaintiff has adequately alleged intentional or willful conduct at this stage of the litigation.[8]  *See Doe P v. Goss*, No. 04-2122, 2007 WL 106523, at *12 (D.D.C. 2007) (finding plaintiff adequately alleged willfulness or intent where the plaintiff alleged "that the CIA initiated two sham investigations 'for the sole purpose of discrediting him and retaliating against him'" and then recorded the false results of those investigations in CIA files); *York*, 698 F. Supp. 2d at 107 (finding plaintiff adequately alleged willfulness or intent based on allegation that Defendant "willfully or intentionally disclosed [her] personal medical information by placing it on [a] shared drive").

Accordingly, for the reasons stated above, the plaintiff has stated a claim for unlawful disclosure in violation of the Privacy Act and the defendant's motion to dismiss this claim is denied.

### 4. Defendant's Motion for a More Definite Statement or Summary Judgment on Count I is denied.

The defendant has requested, pursuant to Rule 12(e), that the Court require the plaintiff to provide a more definite statement of his claims in the event that the Court denies the motion to dismiss.  Pursuant to Rule 12(e), the Court may order a more definite statement of a pleading where the pleading is "so vague or ambiguous that the party cannot reasonably prepare a response."  Fed. R. Civ. P. 12(e).  "[C]ourts are reluctant to compel a more definite statement pursuant to Rule 12(e). . . . [and] [t]o prevent Rule 12(e) from becoming a substitute for

---

[8] The parties have not directly addressed "the legal question of whether intent or willfulness must be pled in the Complaint or merely proven at trial." *York*, 698 F. Supp. 2d at 108 (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510-12 (2002)) (explaining that in employment discrimination cases under Title VII, plaintiffs need not plead every element of a prima facie case of discrimination)).

discovery, courts will generally deny a motion for a more definite statement where the information sought may be obtained in discovery." *Hilska v. Jones*, 217 F.R.D. 16, 21 (D.D.C. 2003). Regarding Count I in this case, the defendant has requested a more definite statement "explaining what information exists to make it at least plausible that . . . the discussion among Agency employees about the fact of [plaintiff's] investigation by the [CIA OIG] was the result of the unlawful release of information from a CIA system of records rather than the independent knowledge of one or more of the [witnesses] interviewed in the investigation." Def.'s Mem. at 42-43. As discussed above, the plaintiff is unlikely to be able to determine the precise circumstances of the release of information absent discovery, and the Complaint is not "so vague or ambiguous" that the defendant "cannot reasonably prepare a response." Accordingly, the motion for a more definite statement is denied.[9]

The defendant's motion, in the alternative, for summary judgment on Count I is also denied because the plaintiff is entitled to discovery. The plaintiff has requested discovery pursuant to former Rule 56(f) – recently amended as Rule 56(d) – of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 56(d); Advisory Committee's Note, 2010 Amendments ("Subdivision (d) carries forward without substantial change the provisions of former subdivision (f)."). Under Rule 56(d), a court may deny a motion for summary judgment, order discovery, or "issue any other appropriate order" if the non-moving party shows that it cannot present the facts needed to oppose the motion. Fed. R. Civ. P. 56(d). A non-moving party

---

[9] The Court adds that a more definite statement regarding the plaintiff's allegations of "actual damages" resulting from the unlawful disclosure, as requested by the defendant, is not warranted before discovery in this case. As noted above, a showing of "actual damages" is necessary to recover for a Privacy Act unlawful disclosure claim. *See Chao*, 540 U.S. at 620-21. In Count I of the Complaint, the plaintiff has alleged he suffered harm "including, but not limited to, emotional trauma . . ." Compl. ¶ 63. In *Doe v. Chao*, "the Supreme Court left open the precise definition of 'actual damages'-whether it is 'restricted to pecuniary loss' or also includes 'adequately demonstrated mental anxiety even without any out-of-pocket loss'-for Courts of Appeals to decide." *Ciralsky v. CIA*, 689 F. Supp. 2d 141, 155 (D.D.C. 2010) (quoting *Chao*, 540 U.S. at 627 n.12). "In this Circuit, this definition remains unresolved." *Id.* at 155-56. Given the current posture of the case law, the Court finds that the plaintiff's Complaint has adequately alleged actual damages at this stage of the litigation.

invoking Rule 56(d) "must state by affidavit the reasons why he is unable to present the necessary opposing material." *McWay*, 269 F.R.D. at 38 (quoting *Cloverleaf Standardbred Owners Ass'n, Inc. v. Nat'l Bank of Wash.*, 699 F.2d 1274, 1278 n.6 (D.C. Cir. 1983)).

The plaintiff has submitted a declaration identifying areas of discovery that would be relevant to establishing his unlawful disclosure claim. *See* Pl.'s Mem., Ex. 2., Rule 56(f) Declaration of Mark S. Zaid, Esq. ("Zaid Discovery Decl."). The plaintiff seeks discovery that would, among other things, establish how the agency employees mentioned in the Complaint learned about the Feldman investigation. *See id.* ¶ 8.

The Court agrees that the plaintiff is entitled to conduct discovery before being required to oppose the defendant's motion for summary judgment.[10] *See McWay*, 269 F.R.D. at 39; *Berkeley v. Home Ins. Co.*, 68 F.3d 1409, 1414 (D.C. Cir. 1995) (noting that another circuit has held that "Rule 56(f) motions should be granted 'almost as a matter of course unless the non-moving party has not diligently pursued discovery of the evidence'") (quoting *Wichita Falls Office Assocs. v. Banc One Corp.*, 978 F.2d 915, 919 n.4 (5th Cir. 1992)). "[S]ummary judgment is ordinarily appropriate only after the plaintiff has been given an adequate opportunity to conduct discovery." *McWay*, 269 F.R.D. at 39 (citing *Americable,* 129 F.3d at 1274). Accordingly, the Court denies without prejudice the defendant's motion for summary judgment on Count I.

### B. The plaintiff has not stated an inaccuracy claim under the Privacy Act.

Counts II, III, and IV allege that the CIA violated subsections (g)(1)(C), (e)(5) and (e)(6) of the Privacy Act by failing to keep accurate records. Compl. ¶¶ 64-83. Subsection (g)(1)(C)

---

[10] The Court does not find that the plaintiff is necessarily entitled to all the discovery sought in his declaration, but simply that the plaintiff may seek relevant discovery to which he is entitled pursuant to the Federal Rules of Civil Procedure before being required to respond to the defendant's motion for summary judgment. *See McWay*, 269 F.R.D. at 39 n.2.

provides a Privacy Act cause of action "[w]henever any agency . . . fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual." 5 U.S.C. § 552a(g)(1)(C). Subsections (e)(5) and (e)(6) impose accuracy obligations that address certain specific situations. Subsection (e)(5) requires an agency to "maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination." 5 U.S.C. § 552a(e)(5). Subsection (e)(6) provides that an agency "make reasonable efforts to assure that [] records are accurate, complete, timely, and relevant for agency purposes" prior to disseminating such records. 5 U.S.C. § 552a(e)(6).

To state a claim for relief under these sections, a plaintiff must show that "(1) he has been aggrieved by an adverse determination; (2) the [agency] failed to maintain his records with the degree of accuracy necessary to assure fairness in the determination; (3) the [agency's] reliance on the inaccurate records was the proximate cause of the adverse determination; and (4) the [agency] acted intentionally or willfully in failing to maintain accurate records." *Chambers v. U.S. Dep't of Interior*, 568 F.3d 998, 1006 (D.C. Cir. 2009) (quoting *Deters v. U.S. Parole Comm'n*, 85 F.3d 655, 657 (D.C. Cir. 1996)); *see also Doe v. U.S. Dept. of Justice*, 660 F. Supp. 2d 31, 43 (D.D.C. 2009).

The plaintiff's inaccuracy claims allege that "The CIA OIG completed a ROI entitled 'Travel-Related Fraud and Waste: Eric R. Feldman (2006-84690IG)' that was not maintained with a degree of accuracy necessary to ensure fairness and it was relied upon to proximately

cause an adverse determination." Compl. ¶¶ 65, 71, 77. The defendant asserts that the inaccuracy claims should be dismissed because Feldman has not adequately alleged any erroneous facts that were maintained in his files and relied upon to cause an adverse determination and because the Privacy Act does not provide any remedy to correct subjective agency judgments or statements of opinion in an employee's files. *See* Def.'s Mem. at 31-34.

The plaintiff's Complaint presents a tension that arises frequently in the context of Privacy Act litigation. While the Privacy Act allows for correction of factual errors, the Act does not provide a legal mechanism for federal employees to second-guess the judgments or conclusions of federal officials regarding adverse personnel decisions. *See Lee v. Geren*, 480 F. Supp. 2d 198, 207 (D.D.C. 2007) ("The Privacy Act allows for the amendment of factual or historical errors. It is not, however, a vehicle for amending the judgments of federal officials . . . [and] may not be employed as a skeleton key for reopening consideration of unfavorable federal agency decisions.") (citation omitted).

In the Civil Service Reform Act of 1978 ("CSRA"), codified as amended in scattered sections of Title 5 of the United States Code, Congress "established an elaborate new framework for evaluating adverse personnel actions [taken] against certain categories of federal employees." *Peter B. v. United States*, 579 F. Supp. 2d 78, 81 (D.D.C. 2008) (citation omitted). The CSRA statutory "scheme is a comprehensive and 'exclusive framework for judicial review of adverse disciplinary actions taken by federal agencies.'" *Id*. (quoting *Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv*., 940 F.2d 704, 709 (D.C. Cir. 1991)). "[T]he CSRA precludes non-CSRA remedies for an adverse personnel action even where the CSRA does not make those remedies available to the plaintiff.'" *Id.* (quoting *Doe*, 2007 WL 106523, at *10); *see also Am. Postal Workers Union, AFL-CIO*, 940 F.2d at 708-09.

The D.C. Circuit has held that the Privacy Act must not be used to circumvent the CSRA's framework for the review of adverse personnel actions. *Kleiman v. Dep't of Energy*, 956 F.2d 335, 338 (D.C. Cir. 1992) ("This court has refused to allow the exhaustive remedial scheme of the CSRA to be impermissibly frustrated by granting litigants, under the aegis of the Privacy Act or otherwise, district court review of personnel decisions judicially unreviewable under the CSRA.") (internal quotations and citations omitted). On the other hand, however, the D.C. Circuit has recognized that "the Privacy Act permits a federal job applicant [or employee] to recover damages for an adverse personnel action *actually caused* by an inaccurate or incomplete record." *Hubbard v. EPA*, 809 F.2d 1, 5 (D.C. Cir. 1986). Due to this tension between the Privacy Act and the CSRA, the D.C. Circuit has explained that "the obvious need to accommodate the two statutory schemes requires the district courts to carefully analyze the asserted causation link [between an alleged inaccuracy and the adverse determination] to be certain they are not exceeding their jurisdiction" under the Privacy Act. *Id.*; *see also Lee*, 480 F. Supp. 2d at 210-11.

With this legal framework in mind, the Court now turns to an evaluation of the plaintiff's factual allegations in support of his Privacy Act inaccuracy claims. As instructed by the D.C. Circuit, the Court will "carefully analyze the asserted causation link" between any alleged inaccuracies and the alleged adverse determination.

The first element that the plaintiff must show to state a claim under subsection (g)(1)(C) of the Privacy Act is that "he has been aggrieved by an adverse determination." *Chambers*, 568 F.3d at 1007. In this case, the only adverse determination alleged is the disciplinary action that the CIA director imposed on Feldman on December 3, 2008 – a five-day suspension, a letter of

reprimand, and reassignment to a new position.[11]  Compl. ¶ 38.  At one point, the plaintiff

appears to suggest that the ROI itself constituted an adverse determination.  *See* Pl.'s Mem. at 28

("[Feldman] very clearly identified the adverse effect that came about as a result of an inaccurate

CIA record, i.e., the ROI.").  The ROI itself is not adverse determination, however, because the

report itself did not have any impact on the terms of Feldman's employment.  *See Lee*, 480 F.

Supp. 2d at 210 ("An adverse action is one resulting in the denial of a right, benefit, entitlement,

or employment by an agency which the individual could reasonably have been expected to have

been given if the record had not been deficient.") (quoting *Privacy Act Implementation:*

*Guidelines and Responsibilities*, Office of Personnel Management, 40 Fed. Reg. 28,948, 28,969

(July 9, 1975)); *see also Chambers*, 568 F.3d at 1007-08 (distinguishing between the "adverse

effect" requirement under Privacy Act subsection (g)(1)(D) and the "adverse determination"

requirement under subsection (g)(1)(C)).  Thus, the plaintiff has alleged an adverse

determination.

 The second element the plaintiff must show is that the agency failed to maintain his

records with the degree of accuracy necessary to assure fairness in the CIA director's

determination.  The Complaint itself does not point to any specific facts contained in the ROI

that are alleged to be inaccurate or erroneous.  Rather, the plaintiff contends that "[m]ost of the

facts that are in dispute from the ROI are identified in the submissions that Feldman made

---

[11] The CSRA does not provide for judicial review of the adverse determination resulting in the plaintiff's five-day suspension in this case.  Under the CSRA, there is no opportunity for either administrative or judicial review of suspensions of fourteen days or less.  *See Lee*, 480 F. Supp. 2d at 203 (citing *United States v. Fausto*, 484 U.S. 439, 450 (1988); *Carducci v. Regan*, 714 F.2d 171, 175 (D.C. Cir. 1983)).  The CSRA also expressly excludes CIA employees from obtaining judicial review of more severe adverse personnel actions, for which the CSRA generally does provide review for other government employees.  *See Peter B.*, 579 F. Supp. 2d at 81; *see also* 5 U.S.C. § 7511(b)(7) (excluding CIA employees from Chapter 75 of the CSRA, which provides procedural safeguards and appeals for employees who have suffered major adverse personnel actions).

internally to the CIA, which obviously means that the CIA is well aware of the actual issues at stake here in the litigation." Pl.'s Mem. at 31 n.16. The plaintiff's method of pleading "most of the facts" underlying his claim by making oblique references to internal agency submissions does not satisfy the federal pleading standard, which requires that "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 129 S.Ct. at 1949. Due to its failure to set forth the factual basis for the inaccuracy claim, the Complaint has not stated a viable cause of action for failure to maintain accurate records.

The Court assumes, however, that the internal submissions the plaintiff is primarily referring to are his responses to the draft and final versions of the ROI. Even if the Court were to rely on these documents for a statement of the facts that Feldman challenges as inaccurate and decide this issue as a motion for summary judgment, Feldman's claim would fail.[12] On June 10, 2008, Feldman and his counsel reviewed the draft ROI at a CIA facility and, on June 18, 2008, "submitted a written response to the draft ROI disproving each and every allegation against him." Compl. ¶¶ 24-25. Feldman acknowledges that the final ROI took these responses into account, although he contends that the report did so only in a very superficial way. *Id.* ¶ 34. Feldman further acknowledges that he and his counsel "submitted a detailed 54-page written response to the [final ROI] on September 25, 2008, that substantially refuted the allegations and OIG conclusions." *Id.* ¶ 35. In characterizing his written refutation of the ROI in the Complaint, Feldman did not cite any factual errors or discrepancies, but rather stated that "[i]t was noted [in his response] that the OIG's determination [i.e., the recommendation of the ROI] was based on selective interpretation of confusing travel regulations that are known to be frequently misapplied and misunderstood, even by those tasked to implement them, especially when

---

[12] Feldman did not submit these documents to the Court, but the defendant has attached them as exhibits to its motion.

multiple agencies are involved." *Id.* In other words, Feldman's response primarily focused on disagreements with the ROI's interpretation of legal issues—not on any factual errors.

The Court has reviewed Feldman's internal agency submissions in response to the ROI and finds that they overwhelmingly consist of legal arguments and arguments about the interpretation of certain facts. The Privacy Act does not provide a cause of action for amending the judgment of federal officials regarding such issues. *See Lee*, 480 F. Supp. 2d at 204. The primary factual dispute raised in the letters is that the plaintiff contends that reports of his and his wife's interviews with OIG investigators distorted what he and his wife actually said. Def.'s Mem., Ex. 3, at 7. Yet in the situations where the plaintiff noted in his draft response that he or his wife had been misquoted or quoted out of context, the final ROI appears to record both versions of the facts. *See, e.g.*, Def.'s Mem., Ex. 4, at 17 n.24, 19 n.26, 21 n.27.

In any event, Feldman does not allege that his written response to the ROI was not taken into account in the CIA director's actual disciplinary determination. To the contrary, the allegations in the Complaint and the CIA director's memorandum to Feldman issued on December 3, 2008 make clear that Feldman's responses were indeed considered in the determination. The CIA director's memorandum to Feldman stated:

> I have carefully considered the ROI (which mentions the Department of Justice's declination of prosecution in this case) and the information provided by you and your attorney. While I do not concur with all of the ROI's conclusions, I find that the ROI describes a consistent pattern of your seeking reimbursements from the Government that were in excess of what was reasonably necessary to conduct your official travel. I have concluded that the manner in which you arranged and conducted your official travel, and the reimbursements you sought as a result of your travel, show that you were more interested in maximizing your personal financial gain than prudently using official travel funds.

Def.'s Mem., Ex. 6, Letter of Reprimand, dated December 3, 2008; *see also* Compl. ¶ 38. It is this fully informed judgment of the CIA director that, at bottom, the plaintiff's Privacy Act claim attempts to challenge. The plaintiff's Complaint has not identified any discrete factual

inaccuracies that this decision relied upon, and it is clear from the director's memorandum that his judgment took into account Feldman's detailed submissions and assertions in response to the ROI before in rendering his decision. Thus, the plaintiff's inaccuracy claims, at their core, attempt to attack the judgment of a federal official, rather than to correct a factual or historical error in an official record that proximately caused an adverse determination. In these circumstances, the plaintiff has not set forth specific facts showing any genuine issue for trial on the question of whether any contested factual statements in the ROI proximately caused his reprimand. Therefore, the Court will dismiss Counts II, III, and IV of the Complaint.[13]

## III.    CONCLUSION

For the reasons stated above, the defendant's motion to dismiss or, in the alternative, for summary judgment is GRANTED in part and DENIED in part. The motion to dismiss Counts II, III, and IV is granted. The motion to dismiss is denied for Count I and the case shall proceed to discovery on that count. Within twenty (20) days of this Memorandum Opinion and the accompanying Order, the parties are directed to meet and confer and to file a joint report with the Court that complies with Local Civil Rule 16.3 and Paragraph 8 of the Court's Standing Order. The Court will then schedule a status conference if necessary.


DATED: July 13, 2011                                                /s/ *Beryl A. Howell*
                                                                             BERYL A. HOWELL
                                                                             United States District Judge

---

[13] The plaintiff's Rule 56(d) declaration primarily identifies areas of discovery that are relevant to the unlawful disclosure claim under Count I of the Complaint. *See* Zaid Discovery Decl. ¶¶ 8-9. The 56(d) declaration also seeks discovery from "witnesses, particularly in an expert capacity with respect to travel regulations, [who] would be deposed to reveal the factual inaccuracies in the CIA OIG's conclusions in its Report of Investigation." *Id.* ¶ 12. This proposed discovery involving travel regulation experts patently relates to *legal* – not factual – disputes. In any event, discovery related to factual inaccuracies in the ROI is unnecessary since these counts are dismissed.